IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division


ROGER S. FULLER, JR.,

      Plaintiff,

v.                                        Civil Action No. 7:17CV564

CARILION CLINIC,
CARILION CHIEF OF POLICE STEVE LUGAR,
and CARILION POLICE CAPT. RON DONELSON,

      Defendants.


**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I. Background

This civil action arises out of an alleged seizure of an employee by his employer's private police department. The plaintiff, Roger S. Fuller, Jr. ("Fuller"), filed a complaint in the United States District Court for the Western District of Virginia, Roanoke Division, on December 20, 2017. ECF No. 1. The complaint alleged claims arising under 42 U.S.C. § 1983 and pendent state claims under 28 U.S.C. § 1367. ECF No. 1. The defendant, Carilion Clinic, filed a motion to dismiss the complaint (ECF No. 3), and the plaintiff then filed an amended complaint. ECF No. 10.

In his second amended complaint, plaintiff Fuller asserted that he was employed by Carilion Clinic as a janitor and that he was at work when he found three burned, wooden stick matches and a signed piece of paper near the Carilion Clinic dentistry lab. ECF

No. 38 at 4. Further, plaintiff Fuller indicated that he then notified the receptionist of the wooden stick matches and the signed piece of paper, and that Carilion Clinic police then arrived to investigate the incident. Id. Carilion Clinic Police and Security Services Department is a private police department maintained by Carilion Clinic and authorized by the Virginia General Assembly. Id. at 3.

In his second amended complaint, plaintiff Fuller alleged that Carilion Clinic police came to plaintiff's residence the following morning and staged a "surround and call out," a swat-style arrest tactic, before entering the plaintiff's home and taking him to the Carilion Clinic police station for questioning. Id. at 5-6. Next, plaintiff Fuller asserted that Carilion Clinic police coerced the plaintiff into confessing to lighting the matches. Id. at 6-7. Lastly, plaintiff Fuller alleged that the plaintiff was terminated from his employment at Carilion Clinic after he refused to meet with Carilion Clinic police without counsel present. Id. at 8. Counts I and II of the amended complaint are claims based on the alleged unreasonable seizure of the plaintiff's person by Carilion Clinic police. Id. at 8-11. Count III is a claim for false imprisonment. Id. at 14-17. Count IV is a claim for intentional infliction of emotional distress. Id. at 18-21.

Defendant Carilion Clinic then filed a motion to dismiss the amended complaint for failure to state a claim. ECF No. 12. The plaintiff filed a response in opposition to the defendant's motion

to dismiss the amended complaint (ECF No. 16), and the defendant then filed a reply to the plaintiff's response in opposition (ECF No. 17). This Court then entered a memorandum opinion and order finding that: (1) any actions by Carilion Clinic police outside of the real property owned, leased, or controlled by Carilion Clinic were not authorized by Virginia Code § 9.1-101, and does not constitute as state action; and (2) assuming without deciding that Carilion Clinic police is a state actor, the plaintiff presented enough evidence that Carilion Clinic may be liable under § 1983. ECF No. 23 at 8-17.

The plaintiff then filed a motion to join additional defendants, Carilion Chief of Police Steve Lugar ("Chief Lugar") and Carilion Police Captain Ron Donelson ("Captain Donelson"). ECF No. 33. This Court granted that motion. ECF No. 37.

After completion of discovery, the defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 49. In their memorandum in support of summary judgment (ECF No. 50), defendants contended that "there is no evidence that the Chief of Carilion's police department 'made a decision to arrest, interrogate, and imprison the plaintiff and that such a decision amounted to a constitutional deprivation'." Id. at 8. Defendants asserted that summary judgment is appropriate under the Pembaur "single decision" exception to respondeat superior liability. Id. Defendants further stated that plaintiff Fuller was never placed under arrest and the tactics used during

the interview were not coercive, referencing their retained law enforcement expert, Carl Wyche. Id. at 9. Defendants indicated that without a custodial arrest or circumstances involving coercive interrogation, defendants did not perform a "public function" giving rise to liability under § 1983. Id. Similarly, defendants contended that since no arrest was made and since plaintiff was never falsely imprisoned, plaintiff's state law claims should be dismissed as a matter of law. Id.

Plaintiff Fuller filed a response in opposition to the defendants' motion for summary judgment. ECF No. 51. Plaintiff Fuller stated that Captain Donelson was acting in performance of his official duties, outside of Carilion Clinic's jurisdiction, when going to plaintiff Fuller's home at the direction of Chief Lugar. ECF No. 52 at 7. In response to defendants' argument that Carilion Clinic police did not perform a "public function," plaintiff Fuller stated that the public function test is not specific as to what duties or jobs the individual officers performed, but whether they are exclusively authorized to act in the first place. Id. at 10. According to plaintiff Fuller, Captain Donelson was dispatched by Chief Lugar to plaintiff's home in furtherance of an investigation, which was consistent with the officer's authority granted by the Virginia General Assembly to deter and prevent crime, and to safeguard life and property. Id. at 11. Moreover, plaintiff Fuller explained that plaintiff believed that he was under arrest and did not feel free to refuse

to accompany the Carilion Clinic officers to the police station, reciting facts regarding the time, place, and purpose of the encounter by Carilion Clinic police, words used, general tone and demeanor, the presence of multiple officers, and display of a firearm. Id. at 11-15. Lastly, plaintiff Fuller asserted that the following decisions, and omissions, by Chief Lugar, or his alleged delegee, Captain Donelson, as policymakers imputed § 1983 liability to Carilion Clinic: (1) authorization of plaintiff Fuller's arrest and transport outside of Carilion Clinic's jurisdiction; (2) failure to supervise the police interrogation of plaintiff Fuller, resulting in a deprivation of plaintiff's civil rights; and (3) a policy of regulating perceived employee misconduct under the guise of police investigation of potential or possible criminal activity.[1] Id. at 15-25.

Defendants filed a reply to plaintiff Fuller's response in opposition to their motion for summary judgment. ECF No. 54. The defendants first stated that the Court should decline plaintiff Fuller's attempt to revisit this Court's prior ruling that as a private police force, Carilion Clinic police cannot be acting under color of state law off premises. Id. at 1-2. Second, defendants contended that plaintiff Fuller cannot establish a policy on the

_____

[1]This Court notes that plaintiff Fuller does not appear to raise a delegation argument in his response to defendants' motion for summary judgment (ECF No. 52) that was raised in his amended complaint (ECF No. 10), namely, plaintiff's argument that Captain Donelson is a delegee and could also act as a policymaker. See ECF No. 10 at 9. Nevertheless, the Court addresses that argument as well.

5

part of Chief Lugar, or Captain Donelson, to treat plaintiff in an unconstitutional manner, eliminating <u>respondeat superior</u> liability on behalf of Carilion Clinic. <u>Id.</u> at 2-3. Third, defendants contended that Carilion Clinic police were not performing a public function when at plaintiff Fuller's home, because this Court has ruled that § 1983 liability cannot apply to Carilion Clinic's off campus activities. <u>Id.</u> at 3. Defendants explained that plaintiff Fuller was told that he was not under arrest and they contended that a reasonable person would not have believed that the setting was custodial. <u>Id.</u> at 3-4. Lastly, defendants stated that there is no policy at Carilion Clinic to use law enforcement in employment matters. <u>Id.</u> at 4-5.

## II. <u>Applicable Law</u>

Under Federal Rule of Civil Procedure 56, this Court must grant a party's motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u> If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted against the plaintiff. <u>Celotex Corp. v.</u>

_Catrett_, 477 U.S. 317, 322 (1986).  In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion.  See _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  See _Celotex_, 477 U.S. at 322-23.  "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact."  _Temkin v. Frederick County Comm'rs_, 945 F.2d 716, 718 (4th Cir. 1991), _cert. denied_, 502 U.S. 1095 (1992).  However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 256 (1986).

## III.  Discussion

Following this Court's review of the fully briefed motions, memoranda, and exhibits submitted by the parties, this Court finds that, for the reasons set forth below, the defendants' motion for summary judgment must be denied in part and granted in part.

### A.  Carilion Clinic, Chief Lugar, and Captain Donelson are state actors under 42 U.S.C. § 1983 for actions taken both on and off premises.

To obtain relief under § 1983, a plaintiff must prove the following elements: (1) the defendant acted under color of state law; and (2) while acting under color of state law, the defendant

deprived the plaintiff of a _federal_ constitutional or statutory right. 42 U.S.C. § 1983; _Flagg Bros., Inc. v. Brooks_, 436 U.S. 149, 155, 98 S. Ct. 1729, 56 L.Ed.2d 185 (1978) (emphasis added).

"An important inquiry in a § 1983 suit against a private party is whether there is an allegation of wrongful conduct that can be attributed to the [s]tate." _Lugar v. Edmondson Oil Co._, 457 U.S. 922, 948, 102 S. Ct. 2744, 73 L.Ed. 482 (1982) (internal quotation marks omitted). Conduct satisfying the state action requirement of the Fourteenth Amendment satisfies § 1983's requirement of action under color of state law. _Id._ at 929. "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." _American Mfrs. Mut. Ins. Co. v. Sullivan_, 526 U. S. 40, 49, 119 S. Ct. 977, 143 L.Ed.2d 130 (1999) (quoting _Blum v. Yaretsky_, 457 U.S. 991, 1002, 102 S. Ct. 2777, 73 L.Ed.2d 534 (1982)) (internal quotation marks omitted). "[L]iability attaches only to those wrongdoers who carry a badge of authority of a [s]tate and represent it in some capacity, whether they act in accordance with their authority or misuse it." _National Collegiate Athletic Ass'n v. Tarkanian_, 488 U.S. 179, 191, 109 S. Ct. 454, 102 L.Ed.2d 469 (1988) (citing _Monroe v. Pape_, 363 U.S. 167, 172, 81 S. Ct. 473, 476, 5 L.Ed.2d 492 (1961)) (internal quotation marks omitted). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by

virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West v. Adkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L.Ed. 1368 (1941)) (internal quotation marks omitted).

In a typical case involving a state action issue, a private party has taken a decisive step that caused harm to the plaintiff, and the question is whether the state was sufficiently involved to treat that conduct as state action, or in other words, whether the state provided a mantle of authority that enhanced power of the harm-causing actors. The United States Supreme Court has created at least seven distinct tests to assist lower courts in dealing with state action issues. See Julie K. Brown, Less is More: Decluttering the State Action Doctrine, 73 Mo. L. Rev. 561, 565 (2008).

Among the various categories is what is often called the "public function test." Under this test, the government confers "core, sovereign power — a power, in other words, that is traditionally the exclusive prerogative of the [s]tate." United States v. Day, 591 F.3d 679, 686 (4th Cir. 2010). "In order to find state power, the function served by the private group must be that which is traditionally and exclusively reserved to the state; the mere fact that the public is benefitted by a private action is insufficient. The Supreme Court has found exclusive state power to

be a very narrow category." Brown, <u>Less is More: Decluttering the</u> <u>State Action Doctrine</u>, 73 Mo. L. Rev. 561, 565 (2008).

The Supreme Court has expressly left open the question of whether and under what circumstances private police officers may be said to perform a public function for purposes of § 1983. <u>See</u> <u>Flagg Bros.</u>, 436 U.S. at 163. Moreover, the United States Court of Appeals for the Fourth Circuit has not directly addressed the issue presented in this case. Although plaintiff Fuller cites <u>Austin v.</u> <u>Paramount Parks, Inc.</u>, 195 F.3d 715 (4th Cir. 1999), the Fourth Circuit expressly stated that the question as to whether the defendant, an amusement park special police officer, was a state actor was "a thorny one, but one which [the Court] need not decide here because [plaintiff's] clear failure to show that an official policy or custom of [defendant] was the moving force behind [plaintiff's] [ ] arrest." <u>Id.</u> at 727. For purposes of deciding that case, the Court assumed without holding that defendant was a state actor, since the Court concluded that defendant did not have an official policy or custom. <u>Id.</u>

However, the Fourth Circuit has addressed whether private security guards could be liable as state actors in <u>Day</u>. In <u>Day</u>, the defendants were armed private security guards of an apartment complex, with the power of arrest pursuant to Virginia Code § 9.1-138, <u>et seq</u>. <u>Day</u>, 591 F.3d at 681. Ultimately, the Court found that the private security guards were not state actors. <u>Id.</u> at 684. In that case, the Court first addressed whether there was

an agency relationship between the government and the officers.[2]
Id. at 684-85.  First, the Court addressed the district court's
view that because Virginia regulates armed security officers and
because they have the power to make certain arrests, Virginia
affirmatively encouraged the challenged conduct of the defendants.
Id.  The Fourth Circuit, contrary to the district court's finding,
found that, with respect to the first factor, the regulatory scheme
merely permitted the officers to arrest the defendant, and did not
require or encourage an arrest or any other complained-of action.
Id.  Because the first factor to establish an agency relationship
was not met, the Fourth Circuit stated that the defendant's private
action would not be considered public action.   Id.   The Fourth
Circuit also addressed the public function test and whether
Virginia's conferral of arrest powers on the officers was enough to
render them de facto police.  Id.  Specifically, the Court stated:

> even [if] plenary arrest authority alone could transform
> a private individual into a state actor, [the defendants]
> did not possess the same power to make warrantless
> arrests afforded to Virginia police officers . . .
> Virginia authorizes an armed security officer 'to effect
> an arrest for an offense occurring . . . in his
> presence.'  Va. Code. Ann. § 9.1-146 (emphasis added).
> The Commonwealth empowers police officers, by contrast,
> to 'arrest, without a warrant, any person who commits any
> crime in the presence of the officer and any person whom
> he has reasonable grounds or probable cause to suspect of
> having committed a felony not in his presence.'  Id.
> § 19.2-81 (emphasis added).  Indeed, not only is the

---

[2]An agency relationship requires the following elements: (1)
the government knew of or acquiesced in the private individual's
challenged conduct; and (2) the private individual intended to
assist law enforcement or had some other independent motive.  Day,
591 F.3d at 685-86.

> arrest power of armed security officers more
> circumscribed than that of police officers, but it is
> also essentially the same as that of any private citizen.

Day, 591 F.3d at 688-89. The Court assumed without deciding whether plenary arrest authority would be sufficient to transform a private individual into a state actor. Id. at 688. Moreover, the Court distinguishes Day from Rodriguez v. Smithfield Packing Co., 338 F.3d 348, 354-55 (4th Cir. 2003), where the Court had previously found a private plant security official could be held liable for his conduct as a state actor. The Court, stated that "the private party was operating in his official role as an auxillary deputy sheriff, served under the direction of and in concert with the Sheriff's Department, and was invested with the full panoply of powers afforded to full-time deputies, including, but not limited to, the power to arrest." Day, 591 F.3d at 688 (internal quotation marks omitted).

Importantly, the Sixth and Seventh Circuit Court of Appeals have addressed factual circumstances that are analogous to the facts presented in this civil action. The Seventh Circuit held that private police officers licensed to make arrests could be state actors under the public function test. Payton v. Rush-Presbyterian, 184 623, 627-30 (7th Cir. 1999). The Court found that the defendants' status as on-duty special police officers, licensed by the City of Chicago, enjoyed "virtually the same power as public police officers." Id. at 629. The defendants in Payton operated under an ordinance which provided that licensed special

police officers "shall possess the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged." Id. at 625 (quoting Chicago City Code § 4-340-100 (1993)).

This broad delegation of power distinguished Payton from an earlier case, Wade v. Byles, 83 F.3d 902, 905-06 (7th Cir. 1996), in which the Seventh Circuit had held that a private security guard endowed with more limited police-type powers was not a state actor. In Wade, the defendant was permitted to carry a handgun and use deadly force in self-defense, but could arrest someone only for "trespass pending the arrival of the police" and could exercise these powers only in the lobbies of the properties where he worked. Id. at 906. The defendant was held not to be a state actor because "none of the these powers had been exclusively reserved to the police — citizen's arrests and the rights to carry handguns and use them in self-defense are available to individuals outside of the law enforcement community." Payton, 184 F.3d at 629 (citing Wade, 83 F.3d at 906).

Similarly, the Sixth Circuit held that a private police officer licensed to make arrests could be a state actor as a matter of law. Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629, 640 (6th Cir. 2005). The Court found that the officer's capacity as an on-duty and state licensed private security police officer, including arrest power, made him liable as a state actor. Id. The defendant in Romanski operated under a statute which vested private security

officers with full arrest authority on the entirety of their employer's premises.  Id. at 639.

The Sixth Circuit found that the facts in Romanski were analogous to the facts in Payton.  The Romanski court explained:

> it is undisputed that [the defendant] (and some of her colleagues) were private security police officers licensed under M.C.L. § 338.1079.  This means that [the defendant's] qualifications for being so licensed were vetted by Michigan's department of state police, [ ] and that [the defendant] was subject to certain statutes administered by that department . . .  [The defendant] 'ha[d] the authority to arrest a person without a warrant as set forth for public peace officers . . .'  M.C.L. § 338.1080.  One consequence of [the defendant's] possession of this authority . . . at all times relevant to this case, [is that the defendant] was a state actor as a matter of law.

Id. at 638.

Both cases highlight the distinction between private actors exercising powers traditionally, but not exclusively reserved to the state, and cases in which a private actor exercises a power exclusively reserved to the state, such as police power.  See Day, 591 F.3d at 687 ("Where private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test.") (quoting Romanski, 428 F.3d at 637).  "[W]hen the state delegates a power traditionally reserved to it alone — the police power — to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be

unaffected." Romanski, 428 F.3d at 635 (internal quotation marks omitted).

This Court finds that this case falls on the Payton/Rodriguez side of the line for the following reasons:

Virginia Code § 9.1-101 defines a "private police department," such as the one at Carilion Clinic as:

> any police department, other than a department that
> employs police agents under the provisions of § 56-353,
> that employs private police officers operated by an
> entity authorized by statute or an act of assembly to
> establish a private police department or such entity's
> successor in interest, provided it complies with the
> requirements set forth herein. No entity is authorized
> to operate a private police department or represent that
> it is a private police department unless such entity has
> been authorized by statute or an act of assembly or such
> entity is the successor in interest of an entity that has
> been authorized pursuant to this section, provided it
> complies with the requirements set forth herein. The
> authority of a private police department shall be limited
> to real property owned, leased, or controlled by the
> entity and, if approved by the local chief of police or
> sheriff, any contiguous property; such authority shall
> not supersede the authority, duties, or jurisdiction
> vested by law with the local police department or
> sheriff's office including as provided in §§ 15.2-1609
> and 15.2-1704. The chief of police or sheriff who is the
> chief local law-enforcement officer shall enter into a
> memorandum of understanding with the private police
> department that addresses the duties and responsibilities
> of the private police department and the chief
> law-enforcement officer in the conduct of criminal
> investigations. Private police departments and private
> police officers shall be subject to and comply with the
> Constitution of the United States; the Constitution of
> Virginia; the laws governing municipal police
> departments, including the provisions of §§ 9.1-600
> [(pertaining to civilian protection in cases of police
> misconduct and setting forth minimum standards)],
> 15.2-1705 [(listing the minimum qualifications for the
> chief of police and all police officers of any locality,
> all deputy sheriffs and jail officers, and all law
> enforcement officers, and waiver requirements)][, 15.2-
> 1706 (pertaining to required certification through

training for all law-enforcement officers, and waiver of requirements), 15.2-1707 (explaining decertification of law enforcement officers),] 15.2-1708 [(pertaining to notice of decertification)], 15.2-1719 [(describing disposal of unclaimed property in possession of sheriff or police)], 15.2-1721 [(explicating disposal of unclaimed firearms or other weapons in possession of sheriff or police)], and 15.2-1722 [(delineating certain records to be kept by sheriffs and chiefs of police)]; and any regulations adopted by the Board that the Department designates as applicable to private police departments. Any person employed as a private police officer pursuant to this section shall meet all requirements, including the minimum compulsory training requirements, for law-enforcement officers pursuant to this chapter. A private police officer is not entitled to benefits under the Line of Duty Act (§ 9.1-400 et seq.) or under the Virginia Retirement System, is not a "qualified law enforcement officer" or "qualified retired law enforcement officer" within the meaning of the federal Law Enforcement Officers Safety Act, 18 U.S.C. § 926B et seq., and shall not be deemed an employee of the Commonwealth or any locality. An authorized private police department may use the word "police" to describe its sworn officers and may join a regional criminal justice academy created pursuant to Article 5 (§ 15.2-1747 et seq.) of Chapter 17 of Title 15.2. Any private police department in existence on January 1, 2013, that was not otherwise established by statute or an act of assembly and whose status as a private police department was recognized by the Department at that time is hereby validated and may continue to operate as a private police department as may such entity's successor in interest, provided it complies with the requirements set forth herein.

Va. Code Ann. § 9.1-101 (West 2018).

Carilion Clinic Personnel Directive 3.01 explains:

The authority vested in sworn personnel comes from § 15.2-1704[3] of the Code of Virginia and is made

---

[3]Virginia Code § 15.2-1704 provides:

Powers and duties of a police force:

A.   The police force of a locality is hereby invested with all the power and authority which formerly belonged

applicable under § 19.2-12 <u>et seq.</u> of the <u>Code of Virginia</u>. Police officers shall have the authority to:

  a.  Prevent and detect crime.
  b.  Apprehend criminals.
  c.  Safeguard life and property.
  d.  Preserve peace and the enforcement of state and local laws, regulations, and ordinances.
  e.  Execut[e] [ ] temporary detention orders and emergency custody orders and any other powers granted to law enforcement offices in § 37.1-808 and § 37.2 809 of the Code of Virginia.
  f.  Serve orders of protection.
  g.  Execute all warrants or summons as may be placed in his hands by any magistrate for the locality and to make due return thereof.

ECF No. 52-12 at 2-3.

---

<u>to the office of constable at common law and is responsible for the prevention and detection of crime, the apprehension of criminals, the safeguard of life and property, the preservation of peace and the enforcement of state and local laws, regulations, and ordinances.</u>

B.  A police officer has no authority in civil matters, except (i) to execute and serve temporary detention and emergency custody orders and any other powers granted to law-enforcement officers in § 16.1-340, 16.1-340.1, 37.2-808, or 37.2-809, (ii) to serve an order of protection pursuant to §§ 16.1-253.1, 16.1-253.4, and 16.1-279.1, (iii) to execute all warrants or summons as may be placed in his hands by any magistrate serving the locality and to make due return thereof, and (iv) to deliver, serve, execute, and enforce orders of isolation and quarantine issued pursuant to §§ 32.1-48.09, 32.1-48.012, and 32.1-48.014 and to deliver, serve, execute, and enforce an emergency custody order issued pursuant to § 32.1-48.02. A town police officer, after receiving training under subdivision 8 of § 9.1-102, may, with the concurrence of the local sheriff, also serve civil papers, and make return thereof, only when the town is the plaintiff and the defendant can be found within the corporate limits of the town.

Va. Code Ann. § 15.2-1704 (West 2010) (emphasis added).

This directive, as well as the Virginia Code, separately address security officers and the relevant provisions that guide their duties.[4]

Moreover, in the Memorandum of Understanding, the Roanoke Police Department and the Carilion Clinic Police and Security Services Department agreed that Carilion Clinic police may use:

> Police Department personnel, equipment and materials <u>when needed</u> in the investigation of any felony criminal sexual assault enumerated in § 18.2-67.5:2 subsection B an § 18.2-67.5:3 subsection B, Code of Virginia 1950 as amended, medically unattended death occurring on property owned or controlled by the institution of higher education or any death occurring on property owned or controlled by the institution of higher education or any death resulting from an incident occurring on such property. <u>All other investigations will be conducted by the [Carilion Clinic police] who will function as the primary investigative entity on all other investigations occurring on property owned, leased, or controlled by Carilion Clinic.</u>

ECF No. 52-10 at 1 (emphasis added).

The power that is granted to Carilion Clinic police, including full arrest power on the premises of Carilion Clinic, is a power traditionally reserved to the state alone. <u>Screws v. United States</u>, 325 U.S. 91, 109-10, 65 S. Ct. 1031, 89 L.Ed. 1495 (1945) (holding that defendants who were officers of the law and who had the power to arrest under state law were acting "under color of" state law). There are no real constraints on defendants' use of that power, so long as they remain on authorized premises, and so

---

[4]The Virginia Code has a separate article that pertains to private security services businesses, such as Sections 9.1-138, 9.1-139 (C, F), 9.1-141(C)(6), and 9.1-146. Those were the provisions addressed in <u>Day</u>.

long as their authority does "not supersede the authority, duties, or jurisdiction vested by law with the local police department or sheriff's office including as provided in §§ 15.2-1609 and 15.2-1704." Va. Code Ann. § 9.1-101. In light of these provisions, and considering the fact that defendants Chief Lugar and Captain Donelson were on-duty during all times relevant to this action, this Court finds that defendants are state actors for purposes of § 1983.

In drawing this conclusion, this Court has focused on the specific powers that defendants have in their capacities as on-duty private police, especially the power to arrest, which does not appear to have the limitations that private security are subjected to, as explained in Day. The power to arrest is "traditionally the exclusive prerogative of the state." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 353, 95 S. Ct. 449, 42 L.Ed.2d 477 (1974).

Moreover, the fact that defendants did not always remain on premises at all times relevant to this case does not change the outcome of whether or not defendants may be liable as state actors. As indicated in Keller v. District of Columbia, 809 F. Supp. 432, 433 (E.D. Va. 1993), a person can act "under color of" state law even if the act violates state law. "The term under color of state law includes not only legitimate exercises of power, but also [m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority

of state law . . ." Id. (internal quotation marks omitted). "It is clear that under 'color' of law means under 'pretense' of law . . . Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." Screws, 325 U.S. at 110. As in Keller, this case raises the issue of whether the defendants' conduct that occurred off premises, as alleged in paragraphs 18 to 25 of the amended complaint, are classified as "personal pursuits" or "oversteps" in the exercise of their authority. Keller, 809 F. Supp. at 435.

Plaintiff relies primarily on Keller to support his argument that the facts that he has alleged in his amended complaint support liability under § 1983. See ECF No. 52 at 6-7. In Keller, plaintiff and District of Columbia officers were driving in the same direction in Arlington County, and the officers were operating marked police department cruisers. Id. at 433. After being stopped, plaintiff was confronted by officers who had drawn and pointed their weapons at him, handcuffed him, and pushed him on the trunk of his car. Id. at 434. Denying dismissal of the plaintiff's § 1983 action against defendants, the Eastern District of Virginia held that the officers were acting "under color of" state law, even though they were acting in a jurisdiction where they did not have actual authority. Id. at 435. The Court in Keller compared the situation to the facts in Wirth v. Surles, 562 F.2d 319, 321 (4th Cir. 1977), cert. denied, 435 U.S. 933, 98 S. Ct. 1509, 55 L.Ed.2d 531 (1978), where the Fourth Circuit held that

an officer acts under color of law when crossing a state line to obtain custody of a suspect, and returns the suspect without extradition to the state where the officer serves, "even when the challenged acts constitute an abuse of authority." Keller, 809 F. Supp. at 435.

Defendants state that this case is more analogous to Robinson v. Davis, 447 F.2d 753, claiming the officers in Keller were performing a function authorized by state law, while in the present case, the officers were not performing any duty imposed on them by state law. ECF No. 54 at 2. This argument is not persuasive. Carilion Clinic police have clear authority as granted by statute and as outlined in the memorandum of understanding. See Va. Code Ann. § 15.2-1704; ECF No. 52-12 at 12.

Moreover, although the facts in this case demonstrate that the officers were wearing badges when going to plaintiff Fuller's house and were armed (see ECF Nos. 52-9 at 10; 52-6 at 1), even if there was an absence of such outward indicia of state authority, a police officer may still act "under color of" state law. Keller, 809 F. Supp. at 436. Since this Court has determined that the defendants are state actors for actions taken on premises, this Court now finds that the defendants may also be liable as state actors for actions taken off premises as well. As Keller indicated:

> Congress has chosen to deter unconstitutional exercises
> of police authority, such as that alleged in the instant
> case, by making conduct subject to monetary liability
> under § 1983. When a police officer, in arresting a
> person, deprives that person of constitutional rights,
> § 1983 liability cannot be made to depend on whether the

officer actually had authority to arrest that individual. It is the nature of the act that triggers liability, not the location of the victim.

Id. at 437.

Therefore, this Court grants plaintiff Fuller's request for this Court to reconsider its initial finding that any actions by Carilion Clinic police outside the real property owned, leased, or controlled by Carilion Clinic were not authorized by Virginia Code § 9.1-101 and would not be considered in analyzing plaintiff's § 1983 claim.

Since the counts in the plaintiff's second amended complaint name Carilion Clinic, as well as individual defendants Chief Lugar and Captain Donelson, this Court will now proceed to analyze Carilion Clinic's liability, as well as the individual defendants' liability.

B. Carilion Clinic is not liable under § 1983.

Plaintiff Fuller has presented three theories as to why the actions of Chief Lugar and Captain Donelson should be imputed to Carilion Clinic. Specifically, plaintiff Fuller claims that Carilion Clinic should be liable due to: (1) Chief Lugar's, or Captain Donelson's, decisions and omissions as policymakers, specifically by authorizing plaintiff Fuller's arrest and transport outside Carilion Clinic's jurisdiction; (2) Chief Lugar's failure to supervise the police interrogation of plaintiff Fuller; and (3) its established policy of regulating perceived employee misconduct under the guise of police investigation of potential or possible

criminal activity.   ECF No. 52 at 16-25.   Each theory will be

addressed separately in turn.

1. <u>Chief Lugar's, or Captain Donelson's, alleged authorization of plaintiff Fuller's arrest and transport outside Carilion Clinic jurisdiction does not establish Carilion Clinic's liability under § 1983 based on the theory that there was an established policy or custom.</u>

A plaintiff may establish the existence of a policy or custom

in several ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens;' or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

<u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (quoting <u>Carter v. Morris</u>, 164 F.3d 215, 217 (4th Cir. 1999)).

It is unclear whether plaintiff Fuller rests his theory that

Carilion Clinic should be liable based only on his contention that

Carilion Clinic has a policy or custom due to Chief Lugar's, or

Captain Donelson's, decisions as final policymakers.   Plaintiff

Fuller also seems to be making an argument that Carilion Clinic

should be liable based on the theory that a policy or custom is

established due to a practice that is so persistent and widespread

as to constitute a custom or usage with the force of law.

Therefore, this Court will analyze plaintiff Fuller's claims under

both potential bases.

a.  <u>The decisions of Chief Lugar, or Captain Donelson, do not establish Carilion Clinic's liability under § 1983 based on the theory that they are persons with final policymaking authority.</u>

Liability may be imposed for a single decision by a policymaker under appropriate circumstances.  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 477, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986).  However, not every decision by an officer leads to automatic § 1983 liability.  Liability incurs where the policymaker has <u>final</u> authority to establish policy regarding the action that was ordered.  "The fact that an official — even a policymaking official — has discretion in the exercise of particular functions does not, without more, give rise to [entity] liability based on an exercise of that discretion."  <u>Id.</u> at 481.

Specifically, power to make policy may be granted by legislative enactment or through delegation by someone who does possess such authority.  <u>Id.</u> at 482.  "[W]hether an official had final policymaking authority is a question of state law[,]" and requires review of "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law."  <u>Id.</u>; <u>Jett v. Dallas Independent School Dist.</u>, 491 U.S. 701, 738, 109 S. Ct. 2702, 105 L.Ed.2d 598 (1989).

Although such principles of § 1983 liability were announced in circumstances involving municipalities or other governmental bodies, "these principles are equally applicable to a private corporation acting under color of state law when an employee exercises final policymaking authority concerning an action that

allegedly causes a deprivation of federal rights." Austin, 195 F.3d at 729.

As to plaintiff Fuller's first theory, plaintiff Fuller states:

> Lugar made a policy decision whereby he authorized Janney and Donelson to go outside Carilion's jurisdiction and perform police duties under color of state law. Lugar erroneously believes that Carilion police have the authority to engage suspects, conduct investigations, interview witnesses, and take persons into custody outside Carilion's jurisdiction by a MOU [Memorandum of Understanding] with the City of Roanoke. As the head of the Carilion Police Department, Chief Lugar is undoubtedly a policymaker.

ECF No. 52 at 17.

According to the Memorandum of Understanding, Carilion Clinic complies with the policies of Carilion Clinic unless those policies or procedures conflict with the Police Department while engaged in an investigation that the Police Department is managing or handling as the primary investigator. ECF No. 52-10 at 4. The person designated as the Chief of Police at Carilion Clinic is also the Director of Police/Security Services. ECF No. 52-12 at 4. The Chief has the same authority granted to police officers, and is responsible for the direction of all activities. Id. at 3-4. The Chief "is responsible for the direction of all activities and shall accomplish this through:" (1) orders (both written and oral), policies, directives, guidelines, guidance, and personal leadership. Id. Although "[t]he Chief of Police may designate, or at his discretion, allow supervisory personnel to designate

temporary replacements to fulfill their duties during absences," captains "shall report to the Chief of Police." Id. at 4.

This Court believes that the plaintiff has set forth sufficient evidence for this Court to find that Chief Lugar possesses final authority with respect to issuing and utilizing various mechanisms to preserve and maintain a secure environment at Carilion Clinic. However, Captain Donelson is not granted such authority and is not a final policymaker. The plaintiff has not presented sufficient evidence that Chief Lugar delegated such authority. Moreover, "[w]hen a[n] [ ] official's discretionary action is subject to review by the [entity's] authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." Riddick v. School Bd. of City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (internal quotation marks omitted). The important issue is whether there is "final policy making. The key here is final. It is not just policy making . . . In other words, it is not just who can make policy . . . [I]t is ultimately in the scheme of things who has the final say-so." Id. Because Captain Donelson does not possess such "final policy making authority," his actions or omissions could not constitute official policy.

The next issue is whether plaintiff Fuller has demonstrated that Chief Lugar possesses final authority with respect to the action ordered, namely, to engage suspects, conduct investigations, interview witnesses, and take persons into custody outside

<u>Carilion's jurisdiction</u>.  Chief Lugar arguably does not possess final authority to order Carilion Clinic police to act outside of their jurisdiction since Virginia Code § 9.1-101 expressly prohibits such action.  Justice White's concurring opinion in <u>Pembaur</u> indicated that just because an official has final decision making authority, does not mean that those decisions could be considered policy.  <u>Pembaur</u>, 475 U.S. at 486.  Justice White explained that the authority to make decisions must be exercised in light of state law.  <u>Id.</u>  "Where the controlling law places limits on [ ] authority, [an official] cannot be said to have the authority to make contrary policy.  <u>Id.</u>  But, as explained in Martin A. Schwartz, <u>Section 1983 Litigation: Claims and Defenses</u>, Volume 1A § 7.15[B], pg. 7-112, n.549:

> Justice White's position [ ] overlooked the possibility that there may exist a de facto municipal practice or custom that is inconsistent with the letter of local law. <u>See</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127, 130-31 (1988).  Moreover, because [ ] officials have authority to act only in accordance with the Constitution, Justice White's reasoning, followed to its extreme, could lead to the conclusion that an unconstitutional [entity] decision by a [ ] decision maker can never represent [ ] policy and could never provide a basis for imposing [entity] liability.  This would effectively overturn the holding in <u>Monell</u> that [covered] entities are subject to § 1983 liability for deprivations of federal rights resulting from the enforcement of [entity] policy.  Fortunately, no other Justice has ever adopted Justice White's position in <u>Pembaur</u>.  In addition, Justice White failed to refer to his <u>Pembaur</u> concurrence in the Court's subsequent municipal liability decisions, <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989), and <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988), perhaps indicating that he retreated from the position he took in <u>Pembaur</u>.

Schwartz, <u>Section 1983 Litigation: Claims and Defenses</u>, Volume 1A § 7.15[B], pg. 7-112, n.549 (emphasis added).

However, the Supreme Court has unambiguously stated that § 1983 does not have a "gaping hole . . . that needs to be filled with the vague concept of <u>de facto</u> final policymaking authority . . . [A]d hoc searches for officials possessing such <u>de facto</u> authority would serve primarily to foster needless unpredictability in the application of § 1983. <u>Praprotnik</u>, 485 U.S. at 131 (internal quotation marks omitted).

Therefore, the critical question presented is whether Chief Lugar established policy or exercised discretion in enforcing existing policy. Applying this distinction is difficult since it raises the issue of whether an official's exercise of discretion that departs from established policy, or state law in this instance, is a mere improper exercise of discretion, or an act constituting the establishment of a policy.

Chief Lugar's decision to permit Investigator Janney and Captain Donelson to go to plaintiff Fuller's house and ask whether he would come to the Carilion Clinic police station could be an exercise of the final decision making authority granted to Chief Lugar by statute and in the Memorandum of Understanding to set guidelines, and practices for other police to maintain peace. However, ultimately, this Court does not need to resolve this issue because, as further explained in Part III(B)(1)(c), plaintiff Fuller has failed to meet the causation element of his claim.

b.  The decisions of Chief Lugar, or Captain Donelson, do not establish Carilion Clinic § 1983 liability based on the theory that permitting Carilion Clinic police to work off premises is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law'.

In some cases, an entity may have a formal rule, such as remaining on certain premises, that is being ignored to the point that a custom or practice is in conflict with it.  In such situations, the custom or practice represents the policy. Scwhartz, Section 1983 Litigation: Claims and Defenses, Volume 1A, § 7.16, pg. 7-147.

As stated in Monell v. Department of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978):

> Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . .  Although not authorized by written law, such practices could well be so permanent and well settled as to constitute 'custom or usage' with the force of law.

(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S. Ct. 1598, 26 L.Ed.2d 142 (1970)).  This theory of liability is well settled.  "[T]here must be 'numerous particular instances' of unconstitutional conduct in order to establish a custom or practice."  Lytle v. Doyle, 326 F.3d 463, 470 (4th Cir. 2003).

Here, plaintiff Fuller asserted that it was a regular practice or custom for Chief Lugar to permit investigations and arrest outside of Carilion Clinic premises.  First, plaintiff Fuller has not shown the "sort of widespread and permanent practice necessary to establish a custom" (id. at 473).  Second, Chief Lugar's alleged decision to allow Carilion Clinic police off premises is a

29

potential violation of Virginia law,[5] and does not in and of itself demonstrate the sort of conduct addressed by § 1983, deprivations due to violations of federal constitutional or statutory rights. See Baker v. McCollan, 443 U.S. 137, 99 S. Ct. 2689, 61 L.Ed.2d 433 (1979); Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L.Ed.2d 405 (1976). Therefore, plaintiff Fuller cannot use this theory to establish § 1983 liability upon Carilion Clinic.

    c. Plaintiff has failed to demonstrate that the policy or custom has a close causal relationship to the violation of plaintiff's federal rights, here unreasonable seizure under the Fourth Amendment of the United States Constitution.

    Plaintiff Fuller must also demonstrate that a single decision, or custom or usage, has a close causal relationship to the violation of plaintiff's federal rights, here, unreasonable seizure under the Fourth Amendment of the United States Constitution. "The causation element is applied with especial rigor when the [ ] policy or practice is itself not unconstitutional, for example, when the [ ] liability claim is based upon inadequate training, supervision, and deficiencies in hiring." Schwartz, Section 1983 Litigation: Claims and Defenses, Volume 1A, § 7.12[B], pg. 7-71.

    Although whether a plaintiff has established the required causal link is normally a question of fact to be determined by a jury based on the particular circumstances (see id. at 6-12), the Fourth Circuit Court of Appeals has stated that, "whether the

_____

    [5]This Court abstains from ruling as to whether such a policy constitutes a violation under Virginia law; however, the Court will assume that such a policy is a violation for purposes of addressing this issue.

evidence is sufficient to create a jury issue is solely a question of law to be determined by the [C]ourt." Estate of Cuffee ex rel. Cuffee v. Newhart, 498 F. App'x 233, 236 (4th Cir. 2012) (citing Charleston Area med. Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc., 6 F.3d 243, 247 (4th Cir. 1993)).

Plaintiff Fuller must specifically demonstrate that enforcement of the policy or practice, regardless of the theory utilized, was closely related to the violation of plaintiff Fuller's federally protected right — here, the Fourth Amendment's protection against unreasonable seizures of persons. "Supreme Court decisions have described the requisite causation as 'moving force,' 'direct causal link,' 'closely related,' and 'actually caused.'" Id. The Fourth Circuit has provided some clarification on proving causation, stating:

> a plaintiff cannot rely upon scattershot accusations of
> unrelated constitutional violations to prove either . . .
> indiffere[nce] to the risk of [plaintiff's] specific
> injury or that it was the moving force behind
> [plaintiff's] deprivation. Instead, a "plaintiff must
> demonstrate that a[n] [entity] decision reflects
> deliberate indifference to the risk that a violation of
> a particular constitutional or statutory right will
> follow the decision." . . . Thus, [ ] liability will
> attach only for those policies or customs having a
> "specific deficiency or deficiencies . . . such as to
> make the specific violation almost bound to happen,
> sooner or later, rather than merely likely to happen in
> the long run." . . . The challenged policy or custom
> cannot merely be the abstract one of violating citizens'
> constitutional rights.

Carter, 164 F.3d 215 (4th Cir. 1999) (emphasis added).

On the record before this Court, plaintiff Fuller's federal claim is that Carilion Clinic police subjected him to an

unreasonable seizure.  The bulk of plaintiff Fuller's arguments pertain to how Carilion Clinic should be held liable based on a policy or custom of allowing police off-premises, and are not relevant to plaintiff's alleged federal constitutional deprivation. According to the deposition transcript from Chief Lugar, Chief Lugar asked Investigator Janney to "go in and ask [plaintiff Fuller] if he would be willing to come [to Carilion Clinic] and talk to [Carilion Clinic police]."  ECF No. 52-5 at 6.  Moreover, Chief Lugar also stated that Carilion Clinic police do not need "[a]uthority to just talk to someone [or] [t]o request them to come and talk to [Carilion Clinic police] . . .  If [Carilion Clinic police] arrest, [they] have to have legal authority to do so and [there are] jurisdictional issues.  But interaction and just going, talking to someone, there is no such thing as an authority or right or jurisdiction[al] authority to be there."  Id. at 8.  Even if considered a policy or custom under § 1983 jurisprudence, which this Court does not believe to be the case, Chief Lugar's alleged decision to allow Carilion Clinic police to ask whether plaintiff could come to the Carilion Clinic police station does not establish a link to the allegedly unlawful seizure that occurred at plaintiff Fuller's home.

2. Chief Lugar's alleged failure to supervise the police interrogation of plaintiff Fuller does not establish Carilion Clinic's liability under § 1983 based on the theory that there was an established policy or custom.

Plaintiff Fuller states:

Chief Lugar had enough knowledge of Fuller's documented mental disability and anxiety that he either knew or should have known that Fuller would likely have a reasonable belief that he was being arrested and taken into custody. Lugar took no precautions to make sure that Fuller understood his constitutional rights, or that Fuller was accompanied by a family member or had counsel present. Lugar did not advise or warn Janney or Donnelson to approach Fuller in a non-confrontational manner. Lugar did not have any portion of the police interview at Carilion recorded. Chief Lugar knew of a fire in the rehab on the evening of September 14th, but did nothing about it until more than 12 hours later after he came to work. He then ignored virtually every factual assertion in Crotts' report . . . Instead Chief Lugar claims it was his understanding that there was an urgent situation with a homeless person on the loose setting fires within Carilion Clinic and he did not know that Fuller suffered from anxiety and Asperger's syndrome, but that Fuller was simply a witness. Chief Lugar's assessment not only strains credulity, but having been provided with the factual information by Officer Crotts and overseeing the investigation of the incident he is charged with the responsibility for insuring that the one and only witness/suspect has his constitutional rights protected. As a hands on Chief who likes to stay abreast of investigations, Chief Lugar failed to follow accepted standards of law enforcement as well as the Carilion Police Personnel Directives 3.01 or 4.13. Lugar also failed to advise Janney and Donelson of the standards that should have been followed, and such failure constitutes an omission to enforce established police standards. As a result of Chief Lugar's omissions, Fuller was deprived of his civil rights.

ECF No. 52 at 18-19.

Plaintiff Fuller alleges claims not only against Chief Lugar, but also against Carilion Clinic itself. "The questions of [entity] liability and a supervisory official's liability are separate and distinct questions." Schwartz, Section 1983 Litigation: Claims and Defenses, Volume 1A, § 7.19[B], pg. 7-232. For supervisor liability, the main question is whether the supervisor's own conduct subjects the plaintiff to a deprivation of

a federally protected right.  Id.  On the other hand, entity liability, depends on whether there was enforcement of a policy, practice, or decision of a policymaker that causes a deprivation of plaintiff's federally protected right.  Id.  "A claim asserted against a supervisory official in both her individual and official capacities can serve as the basis for imposing both personal liability against the supervisor and [entity] liability (the official-capacity claim) if the supervisor is a[n] [entity] policymaker."  Id. at 7-232.1-7-233.

This Court will first address Carilion Clinic's liability under a failure to supervise theory and will assess Chief Lugar's potential liability under such a theory in Section III(C)(1) of this memorandum opinion.

The Fourth Circuit has recognized that a policy can be inferred from omissions.  Wellington v. Daniels, 717 F.2d 932, 935 (4th Cir. 1983).  However, the court clearly stated that "such omissions are actionable only if they constitute 'tacit authorization' of or 'deliberate indifference' to constitutional injuries."  Id.  Most relevant to this particular theory of failure to supervise, the Fourth Circuit has recognized that "a[n] [entity] policy of authorizing or condoning police misconduct can be inferred where the [entity] has been grossly negligent in the supervision and training of its police force."  The court then proceeded to explain that liability based on failure to supervise may be incurred "only in those situations in which there is a

34

history of widespread abuse . . . A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." <u>Id.</u> Once plaintiff has shown that there is a policy, then the plaintiff must demonstrate a direct causal link "where the policy commands the injury of which the plaintiff complains." <u>Id.</u>

Since Chief Lugar is responsible for the implementation of Carilion Clinic police department practices and procedures, his alleged acts and omissions likely reflect entity policy. In the instant case, the alleged entity policy stems from Chief Lugar's alleged failure to: (1) take precautions to assure that plaintiff Fuller understood his constitutional rights; (2) assure that plaintiff Fuller was accompanied by a family member or had counsel present; (3) advise or warn Investigator Janney or Captain Donelson to approach Fuller in a non-confrontational manner; (4) record any portion of the police interview at Carilion Clinic; (5) follow accepted standards of law enforcement as well as the Carilion Clinic Police Personnel Directives 3.01 or 4.13; and (6) advise Investigator Janney and Captain Donelson of the standards that should have been followed. Plaintiff Fuller asserted that such failures constitute omissions to enforce established police standards.

The evidence does not demonstrate that Chief Lugar knew that plaintiff Fuller did not want to go with Investigator Janney and Captain Donelson to the Carilion Clinic meeting room (<u>see</u> ECF No.

35

52-5 at 10), or that Chief Lugar knew that the meeting was not recorded (see ECF No. 52-5 at 10). However, plaintiff Fuller has only pointed to this single incident on which to predicate Carilion Clinic's liability based on a theory of failure to supervise. Viewing the evidence in light most favorable to plaintiff Fuller, there is simply insufficient evidence to support a finding that Carilion Clinic has a history of widespread abuse. Moreover, the plaintiff has failed to provide sufficient evidence of encouragement by Chief Lugar to perpetuate such alleged misconduct.

Therefore, Chief Lugar's alleged failure to supervise the police interrogation of plaintiff Fuller does not establish Carilion Clinic's liability under § 1983 based on the theory that there was an established policy or custom.

3. <u>Carilion Clinic's alleged policy of regulating perceived employee misconduct under police investigations does not establish Carilion Clinic's liability under § 1983 based on the theory that there was an established policy or custom.</u>

In support of this theory, plaintiff Fuller asserted that:

> while Carilion's human resources department may not specifically direct the police department to conduct an investigation, there is clearly a custom or practice whereby the police makes investigative material, obtained under color of law, available to human resources personnel for use in their employment decisions. Judging from Chief Lugar's testimony, human resources doesn't have to ask for the police investigative material, it is automatically given.

ECF No. 52 at 22.

Plaintiff Fuller asserted that it was a regular practice or custom for the Police Department to conduct investigations on behalf of the Human Resources Department. This Court extends and

36

will apply the rules iterated in Section III(B)(1)(b) of this memorandum opinion. Even if that were true, that is perhaps a violation of Virginia law[6] or Carilion Clinic policy, and does not in and of itself demonstrate the sort of conduct addressed by § 1983 — deprivations due to violations of <u>federal</u> constitutional or statutory rights. Plaintiff Fuller has also not demonstrated the "sort of widespread and permanent practice necessary to establish a custom." <u>Randall</u>, 302 F.3d at 206.

Moreover, as a matter of causation, plaintiff Fuller has failed to provide sufficient evidence for this Court to find that Carilion Clinic's policy or custom of allegedly allowing Carilion Clinic police to investigate issues that are to be addressed by the Human Resources Department was the cause of plaintiff Fuller's deprivation of constitutional rights. In <u>Carter</u>, 164 F.3d at 218-19, the Fourth Circuit found that the plaintiff's evidence of previous incidents of "excessive force and the discouragement of citizen complaints, ranges far afield of [the plaintiff's] own alleged constitutional injuries [and] is insufficiently precise to establish . . . a [ ] policy or custom that could have caused [the plaintiff's specific injuries." Similarly, plaintiff Fuller's evidence of prior instances of the alleged involvement of Carilion Clinic police in civil matters does not establish "a direct causal

---

[6]This Court will abstain from ruling as to whether such a policy would be a violation under Virginia law; however, the Court will assume that such a policy is a violation for purposes of addressing this issue.

link[,]" to plaintiff's alleged deprivation.  City of Canton, 489 U.S. at 385.

C.  Chief Lugar is not liable under § 1983 as a supervisor, or otherwise.  However, Captain Donelson may be liable under § 1983.

This Court now turns to an analysis of the liability of defendants Chief Lugar and Captain Donelson.

1. Chief Lugar is not liable as a supervisory official, or otherwise.

"[L]ike any other official sued under § 1983, supervisory officials may be found liable on the basis of their own personal involvement in the wrongful conduct, or for setting the wheels of the unconstitutional conduct in motion."  Schwartz, Section 1983 Litigation: Claims and Defenses, Volume 1A, § 7.19[C], pg. 7-249. A supervisor may not be held liable under § 1983 based on the theory of respondeat superior.  Id. at 7-231.  The Fourth Circuit has held that in order to establish supervisory liability, the following factors must be established:

> (1) supervisor had actual or constructive knowledge that subordinate was engaged in conduct posing pervasive and unreasonable risk of constitutional injury suffered by plaintiff; (2) supervisor's response constituted deliberate indifference to or tacit authorization of the unconstitutional practices; and (3) an affirmative link between supervisor's inaction and plaintiff's constitutional injury.

Id. at 7-249 (emphasis added) (referencing Randall v. Prince Georges County, 302 F.3d 188, 206 (4th Cir. 2002)); see also Wilkins v. Montgomery, 751 F.3d 214, 226 (4th Cir. 2014).  In Randall, the Fourth Circuit further elaborated as to what each prong requires stating that, under the first factor, "the conduct

38

engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread, or at least has been used on several different occasions.'" Randall, 302 F.3d at 206 (citing Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994)); see also Schwartz, Section 1983 Litigation: Claims and Defenses, Volume 1A, § 7.19[C], pg. 7-249 ("The 'courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach.'") (quoting Randall, 302 F.3d at 206).  As to the second prong, a plaintiff must provide more evidence than "a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." Id. (quoting Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984)) (internal quotation marks omitted).  A plaintiff may demonstrate deliberate indifference "by showing a supervisor's continued inaction in the face of documented widespread abuses." Id. (internal quotation marks omitted).

Plaintiff Fuller stated that Chief Lugar was aware of a fire on September 14, 2017, but that Chief Lugar did not take action until the next morning.  ECF No. 52 at 12.  In Chief Lugar's deposition transcript, Chief Lugar stated "[m]y understanding when the report came in . . . [was] that a homeless individual had entered our facility and a fire had been started, and that facility is a locked facility." Id.  Moreover, plaintiff stated that Chief

Lugar read Officer Crotts' report that included plaintiff Fuller's mental disabilities; however, plaintiff indicated that Chief Lugar claimed he did not know the effects of Asperger's syndrome. Id. at 15-16. Plaintiff contended that Chief Lugar then met with Investigator Janney to assess what the next steps should be, and that he then directed Investigator Janney to go off site. Id. at 16. Citing the deposition transcript, plaintiff stated that Chief Lugar expected Investigator Janney to go to plaintiff Fuller's home. Id. at 7, 16. Captain Donelson, who went with Investigator Janney to plaintiff Fuller's home, stated that it was his understanding that Investigator Janney got approval from Chief Lugar to go to plaintiff Fuller's home, stating that Chief Lugar likes "to stay abreast of everything we're doing, especially investigations wise." Id. at 16-17. Plaintiff Fuller also stated that Chief Lugar then saw Investigator Janney and Captain Donelson come in with a person he believed to be plaintiff Fuller. Id. at 14. Based on these events, plaintiff Fuller asserted that Chief Lugar authorized Fuller's arrest and transport outside Carilion Clinic's jurisdiction. Id. at 16. Moreover, plaintiff Fuller contended that Chief Lugar failed to supervise the police interrogation by failing: (1) to take precautions; (2) to advise Investigator Janney or Captain Donelson on how to approach plaintiff Fuller or standards that should be followed; (3) to assure the interview at the meeting room was recorded; and (4) to follow accepted standards of law enforcement as well as Carilion

Clinic Police Personnel Directives 3.01 or 4.13. <u>Id.</u> at 18-19.
Lastly, with respect to plaintiff Fuller's claims regarding how
Carilion Clinic police investigate employment issues, plaintiff
Fuller indicated that Chief Lugar admitted that there was no
evidence of intent for plaintiff Fuller to commit a crime. <u>Id.</u>
at 19. However, plaintiff stated that Chief Lugar indicated that
he was not directed to investigate the burned match incident from
an employee misconduct perspective, and that Carilion Clinic police
do not investigate civil matters and do not operate as an arm of
the Human Resources Department. <u>Id.</u> at 21-22. Plaintiff Fuller
asserted that after Chief Lugar decided there was no crime, he
turned it to the Human Resources Department. <u>Id.</u>

Viewing the evidence in light most favorable to the plaintiff,
this Court finds that the plaintiff's contentions have no merit.
First, the plaintiff has not provided any evidence that these
actions and omissions present a "pervasive and unreasonable risk of
constitutional injury suffered by plaintiff." <u>Randall</u>, 302 F.3d
at 206. Even so, the plaintiff has not provided even the minimal
amount of proof of "several different occasions," where Chief Lugar
has taken or omitted such actions or omissions, and that there were
violations as a result. Therefore, the plaintiff has failed to
meet the first prong under <u>Randall</u>'s test. <u>Id.</u>

As to the second prong, the plaintiff has failed to provide
sufficient evidence of alleged abuses of authority by officers.
Moreover, the plaintiff has failed to provide any reason why Chief

Lugar could or should expect Captain Donelson and Investigator Janney to have allegedly violated plaintiff Fuller's constitutional rights by asking Captain Donelson and Investigator Janney to go to plaintiff Fuller's house to inquire as to whether plaintiff would come to the Carilion Clinic police station.

After the Supreme Court's decision in <u>Ashcroft v. Iqbal</u>,

> § 1983 liability against a supervisory official [can only be brought] on the <u>basis of the supervisor's own unconstitutional conduct, [o]r [sic] at least, conduct that set the unconstitutional wheels in motion</u>. The liability of a supervisor should focus on [the supervisor's] culpability and on causation, i.e., <u>whether the supervisor's conduct was a proximate cause of the violation of the plaintiff's constitutional rights</u>. Although culpability and causation may be analyzed separately, they are closely related because the mo[r]e [sic] egregious the supervisor's conduct, the easier it is to conclude that the supervisor's conduct was a proximate cause of the violation of plaintiff's federally protected rights.

Schwartz, <u>Section 1983 Litigation: Claims and Defenses</u>, Volume 1A, § 7.19[D], pg. 7-269. All of the actions alleged by plaintiff Fuller that could be the cause of plaintiff Fuller's potential deprivation were actions attributed to Captain Donelson and Investigator Janney. Moreover, any of Chief Lugar's actions or inaction were not unconstitutional or conduct that set the "unconstitutional wheels in motion." <u>Id.</u> The plaintiff has therefore failed in establishing the requisite causation.

2. <u>Captain Donelson may be liable under § 1983.</u>

In his amended complaint, plaintiff Fuller asserted that Captain Donelson violated his constitutional right guaranteed by

the Fourth Amendment of the United States Constitution from the unreasonable seizure of his person.[7]  ECF No. 10 at 8.

A § 1983 claim requires proof of three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159-60 (4th Cir. 1997).  State officials sued in their official capacities are not persons for purposes of § 1983; however, state officials sued in their individual capacities are persons and not absolutely immune from suit.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Hafer v. Melo, 502 U.S. 21, 31 (1991).  However, a state actor sued in his or her individual capacity may be entitled to qualified immunity, which "shields [state] officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Meyers v. Balt. Cnty., Md., No. 11-2192, WL 2013 388125, at *4 (4th Cir. Feb. 1, 2013).

This Court will decline to consider whether Captain Donelson is entitled to qualified immunity since the defendant has waived such a defense.  See Noel v. Artson, 297 F. App'x 216, 217 (4th Cir. 2008) (holding that defendants failed to properly raise their

-------------------------------------------------------------

[7]Plaintiff Fuller's § 1983 claim is silent as to capacity. The Fourth Circuit has indicated that a court should "look to the substance of the plaintiff's claim, the relief sought and the course of proceedings to determine the nature of a § 1983 suit when plaintiff fails to allege capacity." Plaster v. Brown, No. 6:05CV00006, 2005 WL 3021961, *3 (W.D. Va. Nov. 8, 2005) (referencing Biggs v. Meadows, 66 F.3d 56, 59 (4th Cir. 1995)).

defense of qualified immunity before the district court where defendants mentioned the immunity defense briefly in their answer, and only "surfaced" such arguments in plaintiff's reply brief in opposition to defendants' motion for summary judgment, even where defendants stated that the reason they did not discuss the defense earlier was due to their belief that plaintiffs' underlying constitutional claims lacked merit).

Moreover, in Cantrell v. Frame, No. 2:18-cv-01106, 2019 WL 1234335, *2 (S.D. W. Va. Mar. 18, 2019), the Court indicated:

> The Fourth Circuit has stated that the defense of qualified immunity should be 'raised . . . distinct from the question of whether a constitutional violation occurred.' Buffington v. Baltimore Cty., Md., 913 F.2d 113, 122 (4th Cir. 1990), cert. denied, 499 U.S. 906 (1991).
>
> Indeed, the Fourth Circuit has been strict in declining to sua sponte consider qualified immunity when not properly presented to the district court: 'Our cases have been consistent on one thing: that to be preserved for appeal, the defense of qualified immunity must be raised in a timely fashion before the district court.' Noel v. Artson, 297 F. App'x 216, 218 (4th Cir. 2008); see e.g., id. at 219 (declining to consider appeal of district court's sua sponte denial of qualified immunity when the defendants did not raise the issue until their reply to the plaintiff's opposition to the summary judgment motion); Sales v. Grant, 224 F.3 d 293, 296 (4th Cir. 2000) (finding that when the defendants 'technically pled their qualified immunity defense in their answers to the initial complaint[,]' but failed to therein elaborate or otherwise present it in their motion to dismiss or for summary judgment, 'we have no trouble concluding that the defendants waived their right to press seriously their claim of qualified immunity[.]'); and see Suarez, 125 F.3d at 226 (declining to consider the merits of qualified immunity when 'the defense was not squarely before the district court.').

a.  Captain Donelson seized plaintiff Fuller.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, . . . . against unreasonable searches and seizures . . ."  U.S. Const. amend. IV.

A seizure occurs when an officer by means of physical force or show of authority has in some way restrained the liberty of a citizen, and the person submits.  Terry v. Ohio, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L.Ed.2d 889, 44 O.O.2d 383 (1968); California v. Hodari D., 499 U.S. 621, 625 111 S. Ct. 1547, 113 L.Ed.2d 690, 59 USLW 4335 (1991).  A show of authority can be verbal or nonverbal, but the plaintiff must show that the government has terminated freedom through means intentionally applied.  Brower v. County of Inyo, 489 U.S. 593, 594, 109 S. Ct. 1378, 103 L.Ed.2d 628 (1989).  In determining whether a seizure occurred, the test is whether the state actor's conduct would have communicated to a reasonable person that he or she is at liberty to decline the state actor's request or to otherwise terminate the encounter.  Florida v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L.Ed. 389, 59 USLW 4708 (1991).  The court may look to the following factors, the presence of which might suggest that a given police-citizen exchange constitutes a seizure: (1) the threatening presence of several officers; (2) display of a weapon by an officer; (3) physical touching of the person; or (4) the use of language or tone of voice indicating that compliance with the officer's request

might be compelled. <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 100 S. Ct. 1870, 64 L.Ed.2d 497 (1980). A state actor does not need to inform the person of their right to refuse in order to establish that a reasonable person would have felt free to leave. <u>United States v. Drayton</u>, 536 U.S. 194, 203, 122 S. Ct. 2105, 153 L.Ed.2d 242 (2002). "Fourth Amendment reasonableness is predominantly an objective inquiry . . . [The Court] ask[s] whether the circumstances, viewed objectively, justify [the challenged] action." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 734, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted).

First, the plaintiff's deposition indicates that Investigator Janney "kind of pushe[d] the door in-open . . . he kind of pushe[d] through the glass part and kind of step[ped] onto . . . the tile area with a mat [vestibule]." ECF No. 52-1 at 14. Plaintiff Fuller stated that the "knocking on the front door, ringing the doorbell, and also the knocking on . . . the glass sliding door on the side of the house . . . constituted storming of the residence." ECF No. 52-1 at 17. Plaintiff Fuller stated that he heard an officer, who he believed to be Investigator Janney, yell his name to come to the door. <u>Id.</u> Plaintiff Fuller then stated that Investigator Janney told plaintiff that plaintiff "need[ed] to come with [Investigator Janney and Captain Donelson] right now or [plaintiff was] going to be charged with felony arson," and that plaintiff was not allowed to make a phone call. ECF No. 52-1

at 14.  In the deposition transcript, plaintiff Fuller stated that this request was made while Investigator Janney was "raising his voice, very intensified, had a tone about it, and he was also touching . . . his gun at this time and he did it five times exactly."  Id.  The plaintiff has submitted an affidavit written by Julie McGlothlin, stating that she lives in close proximity to plaintiff and that she saw two men, presumably Captain Donelson and Investigator Janney, with guns that were "clearly" visible.  ECF No. 52-6 at 1.  Plaintiff Fuller indicated that when he attempted to contact his father, Captain Donelson stated "keep your phone away while Janney is talking."  On the other hand, plaintiff Fuller indicated that after changing into new clothes, Investigator Janney asked whether plaintiff was coming.  ECF No. 52-1 at 15.  Plaintiff Fuller admitted that the officers never touched him, never handcuffed him, and that he was put in the front seat of the car. Id.  Moreover, Captain Donelson's deposition indicates that he and Investigator Janney "were both dressed in plain clothes, both had on polo shirts and slacks . . .  [Their] badge[s] [were] displayed on [their] belt[s]."  ECF No. 52-9 at 10.  In his deposition transcript, plaintiff Fuller stated that once he was in the meeting room, "Janney spoke up and said, so tell me the truth . . . and he said, I can tell that you are lying and you have Asberger's and that makes you stupid and that makes you make things up."  ECF No. 52-1 at 18.

Captain Donelson testified that Investigator Janney was "knocking normally because it took Mr. Fuller probably between three and five minutes before he ever answered the door." Id. According to Captain Donelson, both he and Investigator Janney arrived in a "plain white Chevrolet Impala . . . [with] a light up at the top visor, [that] [ ] can't really [be] see[n] [ ] unless you are looking for it." Id. According to Captain Donelson, "Janney asked Mr. Fuller if he was the one who made the report about the attempted arson. He said that he was. So Janney asked him if he would be willing to come down to the police department and work with [them] . . . as part of [their] investigation of trying to figure out who was trying to set fire to the building." ECF No. 52-9 at 10-11. According to Captain Donelson, plaintiff Fuller "was very enthusiastic about helping . . . He was more than willing to come with [them] and give a statement." Id. at 11. Captain Donelson then stated that at the meeting room, "[t]he first thing that Officer Janney did was make sure that Mr. Fuller understood that he was there voluntarily, that he wasn't under arrest, that he was free to leave at any time, he didn't have to cooperate with [the officers] at all if he didn't want to. Mr. Fuller advised that he understood that . . ." Id. at 13.

Plaintiff Fuller has also submitted an expert witness report from Philip P. Hayden ("Mr. Hayden"). ECF No. 52-11. Mr. Hayden made it clear in that report that "[i]n reaching [his] opinions, [he] has relied upon the writings of the International Association

48

of Chiefs of Police (IACP)[,]" indicating, however, that "[t]here is no one set standard that all law enforcement agencies must follow." Id. at 4.

This Court notes the large differences between Captain Donelson's testimony and plaintiff Fuller's testimony. However, for purposes of deciding this motion for summary judgment, the Court will not make any credibility determinations, and will view the evidence in light most favorable to the plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Under this standard of review, this Court finds that a reasonable person may believe that he or she was not free to leave under the circumstances. The interview seemed to occur in an unfamiliar setting that "felt like an interrogation room." ECF No. 52-1 at 18. The agents wore their badges, and displayed their weapons. Although the agents did not use physical force, there is evidence that there may have been threatening language or an intimidating tone. Concerning the phone calls, plaintiff Fuller alleged that he attempted to contact another individual but was not permitted. Lastly, although there is a question of fact as to whether, and if so, when, plaintiff Fuller was told that he could leave, this Court will refrain from using

such information in deciding whether plaintiff was seized. Determining whether, and when, such information was told to the plaintiff is a question of fact and would improperly involve the Court in making credibility determinations.

Moreover, this case can be distinguished from cases where a seizure was not found. For example, in United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989), the Fourth Circuit found that the plaintiff's interview with the officers was a consensual encounter because the officers were not in uniform, did not display their weapons, or even attempt to intimidate the plaintiff "either physically or verbally." Moreover, the Court emphasized that "the agents never made any attempt to restrain [plaintiff's] movement, but instead walked with him." Id. Lastly, the Court noted that "the officer's tone [ ] remained 'conversational' throughout the encounter . . . treating the questioning as a matter of routine, rather than as a particularized investigation of [plaintiff]." Id.

Further, in Trulock v. Freeh, 275 F.3d 391, 400-01 (4th Cir. 2001), the Fourth Circuit did not find that the plaintiff was seized because: (1) the interview occurred in a familiar setting; (2) the agents did not wear uniforms; (3) the agents did not display weapons; (4) the agents did not use physical force; (5) the agents did not use threatening language or an intimidating tone; and (6) there was lack of evidence that plaintiff attempted to leave the room and was refused or that the agents told her that she was not free to leave the conference room.

As explained above, the facts presented in this civil action can be distinguished from those Fourth Circuit cases where the Court held that the plaintiffs were not seized. Viewing the evidence in light most favorable to plaintiff Fuller, this Court finds that Captain Donelson seized plaintiff Fuller.

> b. <u>A reasonable jury could find that Captain Donelson violated plaintiff Fuller's right to be free from unreasonable seizures.</u>

If there was a seizure then the Court is tasked with deciding whether the seizure was unreasonable. In order to demonstrate that a seizure was unreasonable, a plaintiff must show that the officer seized the plaintiff without probable cause. In other words, "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed an offense." <u>United States v. Williams</u>, 10 F.3d 1070, 1073-74 (4th Cir. 1993). "A plaintiff's claim will survive when it rests upon facts which made it unjustifiable for a reasonable officer to conclude that the plaintiff was violating the law." <u>Sampson v. Highland County VA Board of Supervisors</u>, No. 7:15CV00465, 2017 WL 1383951, *3 (W.D. Va. Apr. 13, 2017). "The validity of the [seizure] does not depend on whether the suspect actually committed a crime; the mere fact that the [plaintiff] is later acquitted of the offense . . . is irrelevant to the validity of the [seizure]." <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L.d.2d 343 (1979). "While obtaining a warrant does not provide <u>per se</u> evidence of

objective reasonableness, there is a 'presumption of reasonableness attached to obtaining a warrant.'" Sampson, No. 7:17CV00465, 2017 WL 1383951, *3 (W.D. Va. Apr. 13, 2017) (citing Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991)). Lastly, the search or seizure must be carried out reasonably. Terry, 392 U.S. at 28.

Captain Donelson stated that when he and Investigator Janney went to plaintiff Fuller's house, there "wasn't any criminal charges" against plaintiff Fuller. ECF No. 52-9 at 10. "At that point there wasn't any criminal charges against anybody because we didn't know for sure who had actually set the fire." Id. No warrant was obtained prior to plaintiff Fuller's seizure. Captain Donelson even admitted that he did not consider plaintiff Fuller to be a suspect. Id. There were no facts which made it justifiable for a reasonable officer to conclude that the plaintiff was violating or violated the law.

Therefore, this Court finds that a reasonable jury could find that Captain Donelson violated plaintiff Fuller's right to be free from unreasonable seizures. Accordingly, the Court shall deny summary judgment on this issue.

D. The defendants' motion for summary judgment is denied as to plaintiff Fuller's claim of false imprisonment, but is granted as to plaintiff Fuller's claim of intentional infliction of emotional distress.

This Court will now turn to plaintiff Fuller's state law claims.

1. <u>A reasonable jury may find that plaintiff Fuller was falsely imprisoned by Captain Donelson.</u>

Under Virginia law, false imprisonment is defined as a "restraint of one's liberty without any sufficient cause therefor." <u>Zayre of Va., Inc. v. Gowdy</u>, 207 Va. 47, 147 S.E.2d 710, 713 (1966). A plaintiff does not need to provide evidence of confinement in a jail or that he or she was placed in custody. <u>Kress v. Musgrove</u>, 153 Va. 348, 149 S.E. 453, 455 (1929). "The plaintiff makes out a case for compensatory damages when he shows that he has been illegally detained without lawful process." <u>Montgomery Ward & Co. v. Wickline</u>, 188 Va. 485, 50 S.E.2d 387, 389 (1948). "If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment." <u>Zayre</u>, 207 Va. at 51.

As this Court has determined that there is sufficient evidence for a reasonable jury to find that Captain Donelson violated plaintiff Fuller's right to be free from unreasonable seizures for purposes of his claim under § 1983, this Court will deny defendants' motion for summary judgment with respect to plaintiff Fuller's claim of false imprisonment. This Court finds that plaintiff Fuller has failed to provide sufficient facts to support a false imprisonment claim against Chief Lugar.

Moreover, since Captain Donelson was acting within the scope of his employment, Carilion Clinic may be vicariously liable for

such acts.  See Abernathy v. Romaczyk, 202 Va. 328, 332, 117 S.E.2d 88, 91 (1960) (finding that vicarious liability may be imposed when a master-servant relationship exists if the servant was acting within the scope of employment).  The Supreme Court of Virginia has indicated that "[t]he courts . . . have long since departed from the rule of nonliability of an employer for wilful or malicious acts of his employee."  Commercial Business Systems v. Bell South, 249 Va. 39, 45 (1995).  "Intentional torts may now be asserted against an employer under the doctrine of vicarious liability."  Doe v. Harris, No. CL5544, 2001 WL 34773877 (Va. Cir. Ct. Apr. 11, 2001).

　　　2. The plaintiff has not provided sufficient evidence to establish a claim of intentional infliction of emotional distress.

　　　Under Virginia law, to establish a claim of intentional infliction of emotional distress, the plaintiff must prove: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's wrongful conduct caused emotional distress; and (4) the emotional distress was severe."  Owens v. Ashland Oil, Inc., 708 F. Supp. 757 (W.D. Va. Mar. 8, 1989).  This is a high standard to meet.  "[L]iability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it."  Hatfull, 416 F.3d 320, 337, 33 Media L. Rep. 2057, 22 A.L.R. 6th 839 (4th Cir. 2005).  "[N]either tortious intent, criminal intent, malicious intent, nor conduct worthy of punitive damages is sufficient to

fulfill the 'outrageous' element." Daniczek v. Spencer, 156 F.
Supp. 3d 739, 759 (E.D. Va. Jan. 11, 2016). "Liability has been
found only where the conduct has been so outrageous in character,
and so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable
in a civilized community." Russo v. White, 241 Va. 23, 27, 400
S.E.2d 160 (1991). "Thus, liability does not extend to 'mere
insults, indignities, threats, annoyances, petty oppressions, or
other triviliaties." Daniczek, 156 F. Supp. 3d at 759. Verbal
abuse has been found not to be outrageous. Harris v. Kruetzer, 271
Va. 188, 201, 624 S.E.2d 24, 31 (2006). "The burden of proof for
this claim is high and not often met, as the plaintiff must prove
his case by clear and convincing evidence." Zaklit v. Global
Linguist Solutions, LLC, 53 F. Supp. 3d 835, 847 (E.D. Va. 2014)
(citing Ruth v. Fletcher, 237 Va. 366, 377 S.E.2d 412 (1989)).

This Court finds that the plaintiff has not shown that Captain
Donelson or Chief Lugar had some ulterior purpose behind their
actions or that such actions rise to the level of recklessness.
Moreover, even when viewing all the evidence in light most
favorable to the plaintiff, including the plaintiff's expert report
(ECF No. 52-11), this Court does not find sufficient evidence that
would rise to the level that Chief Lugar or Captain Donelson acted
outrageously or intolerably. Lastly, the plaintiff has not
provided sufficient evidence that plaintiff Fuller suffered the

sort of severe emotional distress required in establishing this claim.

Accordingly, the defendants' summary judgment motion with respect to this issue is granted.

IV.  Conclusion

For the above reasons, the defendants' motion for summary judgment (ECF No. 49) is GRANTED IN PART and DENIED IN PART.

In summary:

1.    Carilion Clinic is not liable under § 1983, but may be vicariously liable for plaintiff Fuller's state law claim of false imprisonment.

2.    Chief Lugar is not liable in his official or personal capacity under § 1983 or liable for any of plaintiff Fuller's state law claims.

3.    Captain Donelson may be liable in his personal capacity under § 1983 or for plaintiff Fuller's state law claim of false imprisonment.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:    May 21, 2019


                              /s/ Frederick P. Stamp, Jr.
                              FREDERICK P. STAMP, JR.
                              UNITED STATES DISTRICT JUDGE